Rotojot, J.
 

 It may be remarked on the first point, that one of the early acts, that of 1803, for running the line between this State and South Carolina, and appointing commissioners for that purpose, has a proviso, that the extension of the line shall not affect the title of any person to lands entered in either of the States. It would rather seem, that those words are sufficient in themselves to confirm titles to lands, that fell into this State, upon the fixing the boundary. But that construction is rendered more probably correct by subsequent acts of the Legislature. For, in 1804, an act in amendment of that of 1803, was passed, that the Governor might treat with the authorities of South Carolina and Georgia, for settling our boundaries, with a proviso, however, that nothing therein should affect any part of the act of 1803. Then comes an act in 1806, which recites, that there were doubts, whether the act of 1804, did not make the proviso of the act of 1803, extend to Georgia as well as South Carolina, and that it could answer no valuable purpose, so far as it respects Georgia, and might be an impediment to a settlement of boundary with her, and then enacts, that it shall not be construed to extend to Georgia. Accordingly when the commissioners of Georgia and of this State met, in June, 1807, the former declared that their powers were not competent to confirm entries and grants under North Carolina, which should turn out, on running the line, to be within Georgia, but that they were impressed with the justice of confirming some of them, and would recommend them to the liberality of their Government, not doubting the Legislature would confirm such of them in a satisfactory manner; and the final agreement afterwards between Georgia and North Carolina, is silent as to the confirmation of
 
 *527
 
 grants. All this maybe seen in the several acts, -which are to be found in the second volume of the Revisal of 1819, and upon the adjustment of the boundary with South Carolina in 1815, it is simply established as run, marked and described in the agreement of the commissioners, and the plat annexed, and nothing is therein said of the confirmation of grants, either generally or of certain grants in particular ; though, as before seen, it was intended that they should be confirmed. The inference seems to be very strong, that the general words of the act of 1803, were intended to confirm, and did confirm, the first grants by either State within the disputed territory ; and that for that purpose, all the territory was to be considered as disputed, for which the respective States had opened land-offices and issued grants, as it was well known that no such offices had been opened, as to any territory, remote from the contested line. The difference, to either State, was of no consequence, being only the purchase-money for vacant lands, which at the time was very low, and made so for the purpose of inducing persons to take them up and settle them, so as to bring them into cultivation and make them subject to taxation, a purpose effected almost as well by taking a grant from one State as the other. At all events, there could be no sufficient motive for annulling them, and thereby defeating the settlement of the boundary, and working a prejudice to persons, who had taken titles upon the public faith of one of the parties. It was certainly understood, in this State, at the time of settling the boundary with South Carolina, that there was a mutual confirmation of grants ; and no instance is known of a grant by South Carolina being held void, except where it would have been so held, if issued by North Carolina, that is, where the same land was covered by a prior patent from this State. The Court considers, therefore, that the act of 1803, gives validity to the grant to Eeade.
 

 But that is not, really,'material to the title in this case. Eor although by virtue of the grant and Eeade’s conveyance to Phillips, the title became vested in Phillips, yet, it is clear, that it is not now in him or his heirs. The subsequent contin
 
 *528
 
 ued possession of Smith for twenty-one years, claiming to hold the premises, as his own, under a purchase' from Phillips, raise a plenary presumption, of a conveyance from Phillips, to him. If such a presumption is proper, in any case, h is in this. Smith’s possession began as that of purchaser, ami was continued throughout as owner, and; a presumption-of a conveyance from any, and all persons, arises, which is necessary to vest the title in him. It is, therefore, immaterial, whether the united possessions of Phillips and Smith,- were sufficient to divest the title out of the State, or whether the grant to Eeade had that effect; for, admitting the title to have been in Phillips, he has it not now ; because, by presumption from lapse of time and possession, it is in Smith.
 

 Therefore, the only count on which the plaintiff could recover, is that on the demise of Freeman, on his title derived from Joseph Smith, supposing him to be the son and heir, or one of the heirs of Moses. On that point, it may be, the. jury would have found for the plaintiff on the circumstances Put he distrusted that, and took a nonsuit on the ground, that the name jwr
 
 se
 
 was evidence in law, that Joseph Smith, the bar-gainor, and Joseph Smith, the son of Moses, was the same person. But on that point, the plaintiff is certainly mistaken. There is a possibility, and there may be a probability of the identity of the person in this case. But the possibility or probability is to be judged of by the jury from the name, the residence of the person, and of the other members of the family, the price paid for the land, compared with its value', and the facility with which the identity might be proved, if it existed, and other circumstances. But the law laj-s down no rule on the subject, and, as is evident in respect to so common a name, can lay down none.
 

 The title being in no one of the lessors of the plaintiff, the judgment must be affirmed.
 

 PeR Curiam, Judgment affirmed.
 

 L